**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CATHERINE J. WOODRUFF,      ) | CASE NO. 1:12-CV-1752 |
|                     ) | |
|          Plaintiff,       ) | |
|                     ) | MAGISTRATE JUDGE |
|          v.             ) | VECCHIARELLI |
|                     ) | |
| MICHAEL J. ASTRUE,        ) | |
|     Commissioner of Social Security,    ) | |
|                     ) | **MEMORANDUM OPINION AND** |
|          Defendant.     ) | **ORDER** |

Plaintiff, Catherine J. Woodruff[1] ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"),

denying her applications for Supplemental Security Income ("SSI") under Title XVI of

the Social Security Act ("Act"), and Period of Disability ("POD") and Disability Insurance

Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 416(i), 423, 1381(a).

This case is before the undersigned United States Magistrate Judge pursuant to the

consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the

reasons set forth below, the Commissioner's final decision is REVERSED and

REMANDED for further proceedings consistent with this Memorandum Opinion and

Order.

---

[1]     The medical records identify Plaintiff as "Catherine Joe Hathaway."  (*See*,
e.g., Tr. 386.)  However, neither party disputes that the medical records in
the transcript are Plaintiff's medical records.  Further, her applications
reflect that she has used the names "Catherine Jo Woodruff" and
"Catherine Joe Woodruff."  (Tr. 125, 128).

# I.  PROCEDURAL HISTORY

On August 18, 2009, Plaintiff filed her applications for SSI, POD and DIB, alleging a disability onset date of July 26, 2008.  (Transcript ("Tr.") 22.)  The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On September 17, 2010, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*.)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On October 13, 2010, the ALJ found Plaintiff not disabled.  (Tr. 31.)  On May 11, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On July 9, 2012, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On November 26, 2012, Plaintiff filed her Brief on the Merits.  (Doc. No. 15.)  On January 1, 2013, the Commissioner filed his Brief on the Merits.  (Doc. No. 16.)  On January 31, 2013, Plaintiff filed a Reply Brief.  (Doc. No. 18.)

Plaintiff argues that the ALJ erred in: (1) failing to incorporate several aspects of Plaintiff's June 2009 functional capacity exam ("FCE") into his determination of Plaintiff's residual functional capacity ("RFC"), despite granting great weight to the FCE; (2) evaluating and applying elements of Dr. Renneker's opinion; (3) relying on an erroneous understanding of whip lash injuries to find Plaintiff not credible; (4) formulating an RFC that did not match his hypothetical to the VE; (5) failing to identify Plaintiff's transferable skills that would allow her to perform semi-skilled work; (6) adopting the unreliable estimates of the VE; (7) failing to identify what percentage of

2

the jobs identified by the VE were part-time positions; and (8) failing to rule on issues raised by Plaintiff in her post-hearing brief.  The Commissioner generally responds that the ALJ did not err in assessing and analyzing the medical evidence, or in considering whether Plaintiff's limitations precluded her from performing work, and that substantial evidence supports the ALJ's decision.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff graduated from high school and had attended truck driving school.  (Tr. 335.)  She also had an associate's degree in law.  (*Id*.)  She had past relevant work as a truck driver.  (Tr. 41.)

### B.  Relevant Medical Evidence

On July 25, 2008, Plaintiff reported to staff at Concentra Medical Centers ("Concentra") that she had injured her back in an automobile accident the previous day.  (Tr. 343.)  According to Plaintiff, she had been driving her employer's truck at approximately 15 miles per hour, and had struck a car that pulled out in front of her.  (*Id*.)  Plaintiff complained of pain in her head and neck, exacerbated by flexion and extension.  (*Id*.)  Concentra staff noted that Plaintiff experienced no cervical pain on motion, and had a full range of motion and no bruising.  (*Id*.)  Three x-rays of Plaintiff's cervical spine were negative.  (*Id*.)  Concentra staff diagnosed Plaintiff with cervical strain and prescribed a muscle relaxant and Vicodin.  (Tr. 344.)  Plaintiff was permitted to return to regular activity but not released from care, and instructed to follow up with Concentra in three days.  (*Id*.)

3

An August 21, 2008 MRI of Plaintiff's cervical spine revealed no abnormalities. (Tr. 431.)

On June 25, 2009, Plaintiff underwent a functional capacity evaluation performed by physical therapist Pat Carey, P.T., and occupational therapist Julie M. Hickin.  (Tr. 333-39.)  They concluded that Plaintiff could function "at a light physical demand level," with the recommendations that Plaintiff: (1) continue with pain management efforts; (2) perform "light work where she will be able to change positions frequently, i.e., sit to stand or walk"; and (3) could not engage in overhead lifting.  (Tr. 333.)  They determined that Plaintiff could: (1) occasionally (meaning up to one-third of the day): sit, stand, reach (overhead and forward), squat, kneel, walk, make repetitive leg and arm movements, and use foot controls; and (2) rarely: bend, climb, crawl or balance.  (Tr. 337.)  The therapists noted that Plaintiff had undergone four facet injections and physical therapy to address her pain.  (Tr. 334.)  Plaintiff reported that driving was "jarring, feels like her head is banging on her spinal cord."  (Tr. 335.)

On July 1, 2010, Plaintiff underwent an independent medical evaluation performed by Nancy Renneker, M.D..  (Tr. 388-93.)  Dr. Renneker noted Plaintiff's complaints of constant headache and neck pain, neck stiffness and decreased right grip strength.  (Tr. 390.)  Dr. Renneker's examination revealed normal gait, muscle spasms in Plaintiff's neck on active range of motion, reduced range of motion in the neck, and reduced right grip strength.  (Tr. 391.)  Dr. Renneker opined that Plaintiff had a "15% whole person impairment" due to decreased active neck range of motion and post-traumatic headaches.  (*Id*.)  She assigned Plaintiff the following permanent job restrictions: (1) no overhead work, repetitive neck rotation or sustained neck flexion,

4

noting that Plaintiff would require a five minute break after 30 minutes of desk work;
(2) no repetitive use of her right arm and no pushing or pulling with either arm; and
(3) occasionally lifting and carrying for 10 to 15 yards no more than 10 pounds.  (*Id.*)
She opined that Plaintiff required a sedentary job with no overhead work and no
repetitive neck rotation.  (*Id.*)

**C.    Agency Reports**

On November 23, 2009, agency consultant W. Jerry McCloud, M.D., performed
a physical RFC assessment.  (Tr. 365-72.)  He opined that Plaintiff could: lift 20 pounds
occasionally and 10 pounds frequently; stand and/or walk for about six hours in an
eight-hour workday; and sit for about six hours in an eight-hour workday.  (Tr. 366.)  He
noted that Plaintiff's October 2008 MRI showed minimal degenerative changes.  (*Id.*)
Dr. McCloud assigned Plaintiff no postural, manipulative, visual, communicative or
environmental limitations.  (Tr. 367-68.) On April 19, 2010, agency consultant William
Bolz, M.D., affirmed the physical RFC assessment, noting that Plaintiff's January and
February 2010 examinations revealed normal gait, reflexes, walking, strength, and
range of motion.  (Tr. 387.)

**D.    Hearing Testimony**

    **1.    Plaintiff's Hearing Testimony**

At her September 17, 2010 administrative hearing, Plaintiff testified as follows:

Plaintiff lived with her two children  - aged 13 and 14 – and her mother.  (Tr. 42-
43.)  She had most recently driven the day before the hearing.  (Tr. 43.)  On the day of
her July 2008 accident, Plaintiff was driving a tractor-trailer.  (Tr. 44.)  As she drove

through a parking lot after having just made a delivery, a pickup truck ran a stop sign in front of her.  (Tr. 43.)  She slammed on her brakes to avoid hitting the truck, but still collided with it.  (Tr. 43-44.)  Plaintiff sought medical treatment the next day.  (Tr. 44.)  She had received workers compensation benefits until March 2009, when a worker's compensation physician concluded that she had reached maximum medical improvement.  (Tr. 44-45.)

Plaintiff cared for her two children.  (Tr. 48.)  She had not undergone any surgeries to treat her pain.  (*Id*.)  Plaintiff did not believe she could return to driving a truck because of the "jostling and the bouncing around."  (Tr. 49.)  She did not drive her own personal vehicle, and the longest drive she had taken since the accident was the two-hour drive to her independent medical examination with Dr. Renneker.  (*Id*.)

**2.      Vocational Expert's Hearing Testimony and Cross-Examination**

Prior to hearing the VE's testimony, the ALJ instructed the VE not to consider whether Plaintiff could perform her past relevant work, and to consider only "sedentary-type" jobs.  (Tr. 41.)  The ALJ gave the VE the following hypothetical:

> Consider a claimant similar in age and education with an RFC . . . that would permit her to do a large number of sedentary jobs, but with the following conditions: the sedentary work should not involve overhead work and should not involve repeated or repetitive rotations of the neck.  And if need arose, the ability to maybe stand at the worksite, workstation for a very brief period of time to . . . have a limited opportunity to sit and stand.

(Tr. 52.)  The VE testified that the hypothetical individual could perform the following jobs:

> One would be customer service, which is sedentary, SVP 4. DOT is 249.362-026.  There are approximately 800 jobs

6

> locally, 5,000 in Ohio, and 150,000 nationally.  Another
> possibility would be telemarketer, which is sedentary, SVP 3.
> DOT is 299.357-014.  There are approximately 1,500 jobs
> locally, 15,000 in Ohio, and 180,000 nationally.  Another
> possibility would be data entry clerk, which is sedentary,
> SVP 4.  DOT is 203.582-054.  There are approximately
> 1,500 jobs locally, 8,000 in Ohio, and 150,000 nationally.
>
> *  *  *
>
> At the unskilled level, one would be an addresser, which is
> sedentary, SVP 2.  DOT is 209.587-010.  There are
> approximately 1,000 jobs locally, 6,000 in Ohio, and 160,000
> nationally.

(Tr. 52-53.)

On cross-examination, Plaintiff's counsel inquired regarding the frequency of

repetitive arm movements required by the addresser position:

> Q:  Okay.  Let's just focus on the addresser occupation.
>     Wouldn't there be repetitive use of the arms in . . .
>     that occupation?
>
> A:  Not on a frequent or constant basis.

(Tr. 60.)

The VE testified that he had relied on "Job Browser Pro software from SkillTran"

to ascertain the number of jobs available.  (*Id.*)  He conceded, however, that he was not

certain whether his source for the numbers of jobs available in each region included

part-time jobs:

> Q:  And, the figures that you're using are from
>     government surveys that include both part-time and
>     full-time jobs.  Isn't that correct?  And doesn't Skilltran
>     even say that?
>
> A:  Well, I'm not sure.
>
> Q:  Okay.  So, these may include part-time as well as full-

7

time –

A:      They might.

(Tr. 60-61.)  In response to Counsel's question regarding how he arrived at the

number of jobs in of the occupations he identified, the VE explained that, "to be

conservative – because of the economy – I took the numbers estimated in the source . .

. and cut them in half."  (Tr. 61.)  Further, the VE conceded that SkillTran did not

provide the numbers for specific occupations:

Q:      [I]sn't it true that SkillTran and none of the
        government publications actually count jobs by
        specific DOT title?

A:      Yes.  Uh-huh.

Q:      And so that's what you're using?  Are you --

A:      Yes.

Q:      – are you using all of the --

A:      I'm using whatever numbers Job Browser gave me.

Q:      Okay.

A:      And then I cut those in half.

Q:      Okay.

A:      But – because I think that's a more realistic estimate.

Q:      So, it's half of the jobs that exist in the . . . OES
        group, for the region.

A:      In – I believe that's right.

Q:      And each OES group may have anywhere from one
        occupation in it to thousands of occupations.

A:      It depends on the job.

8

(Tr. 61-62.)

Counsel requested  – and the ALJ granted – leave to file a post-hearing brief challenging the VE's conclusions regarding the availability of the jobs he identified in response to the hypothetical.  (Tr. 63-64.)

**E.     Plaintiff's Post-Hearing Brief**

In a post-hearing brief, Plaintiff argued that the VE's conclusions regarding work that could be performed by the ALJ's hypothetical individual were flawed because: (1) only one of the jobs – addresser – was unskilled, and there was no proof that Plaintiff had transferable skills or recent education leading directly into skilled work; (2) the addresser position, which involved addressing items by hand or typewriter – was obsolete; (3) the VE had overstated the number of addresser positions available in the region; (4) the VE recited the number of jobs available in the same category as addresser, which included six other occupations, none of which was unskilled; (5) the VE conceded that he did not know how many of the available addresser jobs were part time; and (6) in the Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles, the position of addresser is characterized as involving "frequent reaching."  (Tr. 402-03.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any

9

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

10

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Plaintiff meets the insured status requirements of the Act through December 31, 2012.

2.    Plaintiff has not engaged in substantial gainful activity since July 26, 2008, the alleged onset date.

3.    Plaintiff has the following severe impairments: cervical strain secondary to a motor vehicle accident in July 2008.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a).  Specifically, she can lift, carry, push and pull ten pounds occasionally and less than ten pounds frequently.  She must be able to change from sitting to standing and vice versa for brief periods as necessary to accommodate her pain.   She cannot perform work requiring repetitive neck rotation.  She cannot perform overhead work.

6.    Plaintiff is unable to perform any past relevant work.

7.    Plaintiff was born on January 12, 1976 and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.    Plaintiff has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not an issue in this case because Plaintiff's past relevant work is unskilled.

10.    Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.    Plaintiff has not been under a disability, as defined in the Act, from July 26, 2008, through the date of this decision.

(Tr. 24-32.)

11

## V.    LAW & ANALYSIS

**A.    Standard of Review**

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.    Plaintiff's Assignments of Error**

Plaintiff raises multiple bases for asserting that substantial evidence does not

12

support the ALJ's conclusions in this case, as well as several arguments that the ALJ

erred as a matter of law.  This Court addresses these arguments in the most logical

order.

**1.      Whether the ALJ Erred in Relying on the VE's Testimony Regarding the Number of Available Jobs**

Plaintiff argues that the ALJ adopted unreliable estimates from the VE regarding

the number of available positions for each of the occupations the VE identified during

his testimony.  Specifically, Plaintiff notes that the ALJ accepted as reliable the VE's

estimates regarding the number of positions available in each occupation identified by

the VE, despite the VE's testimony that: (1) he arbitrarily reduced the numbers by half;

(2) his source for the number of jobs available grouped the jobs into categories and

provided the number of jobs available for each category of occupations, rather than for

a specific occupation; and (3) he was not certain whether the number of available

positions included part-time positions.

In support of his decision to accept the VE's testimony on this issue, the ALJ

indicated that the VE had testified that: (1) SkillTran was not the only source on which

he had relied in reaching his opinion about the number of positions available; and (2) he

had reduced the number of positions in order to account for the RFC of the hypothetical

individual described by the ALJ.  Substantial evidence, however, does not support

these bases for the ALJ's decision on this issue.  Although the VE affirmed – at the

beginning of the hearing and in response to the ALJ's question – that his testimony

would be based on "some type of empirical standard as best as possible" (Tr. 40.) –

during cross-examination regarding the number of positions available for each

13

occupation, he acknowledged that he was relying on SkillTran for the numbers at issue
in this case.  (Tr. 60 (testifying, in reference to SkillTran, "That's what I'm looking at right
now.").)  Further, the record reflects that the VE did not, in fact, testify that he had
considered Plaintiff's RFC in opining regarding the number of available positions.[2]  The
Commissioner contends that substantial evidence supports the ALJ's decision because
Plaintiff's counsel elicited testimony regarding these issues on cross-examination.
However, the fact that Plaintiff's counsel was able to explore these issues on cross-
examination does not preclude them from being the basis of error.

The VE's testimony on cross-examination revealed multiple bases that could call
into question the reliability of his opinion regarding the number of positions for each
occupation that he identified.  Given that substantial evidence does not support the
ALJ's stated reasons for accepting that testimony as reliable, the Plaintiff is entitled to
remand on this issue so that the ALJ can consider further evidence and/or clarify the
bases for the VE's testimony.

### 2.      Whether the ALJ Erred in Failing to Identify Transferable Job Skills

Plaintiff contends that the ALJ erred in determining that she was capable of
performing three of the jobs identified by the VE – customer service representative,
telemarketer, and data entry clerk – without identifying any transferable skills.
According to Plaintiff, the ALJ's failure to identify the skills from past work that would
allow her to perform the requirements of these position violated Social Security Ruling

---

[2]      In support of this argument in its Brief, the Commissioner cites to the
ALJ's decision, rather than to any testimony of the VE.  (Commissioner's
Brief ("Comm. Br.") at 15.)

82-41.

Plaintiff's argument is founded on the ALJ's conclusion that her past relevant work experience consisted of unskilled work.  (Tr. 29.)  There is no dispute that the three positions at issue were SVP level 3 or 4 (Tr. 52-53), and, thus, constituted semi-skilled positions.  *See* SSR 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).  Under the Medical-Vocational rules ("the Grids"), the [a]bility to perform skilled or semi[-]skilled work depends on the presence of skills which may be transferred to such work from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semi[-]skilled work."  SSR 83-10, 1983 WL 31251, * 3 (Jan. 1, 1983).  Further, under the relevant regulations, "[a] person does not gain work skills by doing unskilled jobs."  20 C.F.R. § 404.1568(a).  Finally, under Social Security Ruling 82-41, "[w]hen a finding is made that a claimant has transferrable skills, acquired work skills must be identified . . . in the . . . ALJ's decision."  SSR 82-41, 1982 WL 31389, *7 (1982).  According to Plaintiff, based on these authorities, because her past relevant work was unskilled, in order to find that she could perform the semi-skilled positions identified by the VE, the ALJ must have determined that certain of Plaintiff's skills transferred to those positions.  If so, the Plaintiff contends that the ALJ was required to identify those skills from her past work – or acquired through recent education – that would allow Plaintiff to perform the semi-skilled jobs identified by the VE. Plaintiff contends that the ALJ's failure to identify any transferrable skills constitutes error.

Plaintiff's argument is not well taken.  Under the Grids, where a claimant of Plaintiff's age and education level is restricted to sedentary work and has only unskilled

past relevant work experience, an ALJ is generally required to make "an adjudicative assessment of factors" to determine whether that claimant "will be able to make an adjustment to other work." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(h)(3); *see also* § 201.27.  These factors include "any transferable skills or education providing for direct entry into unskilled work." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(h)(3). This assessment would seem to be what is required by SSR 82-41.  However, the Sixth Circuit has determined that SSR 82-41's identification requirement "appl[ies] only when an ALJ relies solely on the grid, in which case the ALJ must ascertain whether the claimant has transferable skills in order to apply the grid." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004).  In *Wilson*, the Sixth Circuit implicitly recognized that, while some cases fall squarely under the guidelines of the Grids, in other cases, a claimant may "suffer[] from a limitation not accounted for by the grid." *Id.* at 548.  According to the Sixth Circuit, in those cases, "the Commissioner may use the grid as a framework for [his] decision, but must rely on other evidence to carry [his] burden.  In such a case, the Commissioner may rely on the testimony of a vocational expert to find that the claimant possesses the capacity to perform other substantial gainful activity that exists in the national economy" *Id.* at 548.  Under *Wilson*, the identification requirement of SSR 82-41 does not apply to cases in which the Grids are used as a framework for the ALJ's decision because the Grids do not account for the claimant's limitations. *Id.* at 549-50.

In this case, the ALJ concluded that Plaintiff did not have the capacity to perform the full range of sedentary work.  (Tr. 30 ("If [Plaintiff] had the [RFC] to perform the full

16

range of sedentary work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 201.27.  However, [Plaintiff's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations.").) Accordingly, because the Grids did not account for Plaintiff's limitations, the ALJ did not rely on the Grids to determine whether she was disabled.  Rather, the ALJ relied on other evidence – the testimony of the VE – to determine whether Plaintiff could perform other work.  (*Id.*)  Accordingly, under *Wilson*, SSR 82-41 did not apply in this case, and the ALJ did not err in failing to identify Plaintiff's skills that would transfer to the semi-skilled level.

### 3. Whether the ALJ Erred in Rejecting Dr. Renneker's Opinion That Plaintiff Was Precluded from Repetitive Movement of Her Right Arm

In her evaluation, Dr. Renneker assigned Plaintiff significant limitations on the use of her arms, noting, "no repetitive use of right arm for any task, no pushing or pulling with either arm."  (Tr. 391.)  Although the ALJ otherwise assigned great weight to Dr. Renneker's opinion, he rejected this portion of her conclusions, observing, "Dr. Renneker's limitations on [Plaintiff's] arms are not supported by the objective evidence or by the fact that [Plaintiff] was able to extensively fill out forms connect[ed] with her appeal, care for her children, drive a car, perform household chores, and do woodworking."  (Tr. 29.)  Plaintiff argues that substantial evidence does not support the ALJ's decision to reject the portion of Dr. Renneker's opinion precluding her from performing repetitive movements with her right arm.  The Commissioner responds that substantial evidence in the record supports the ALJ's conclusion.

The ALJ did not accurately characterize the record with respect to several of the

17

non-objective findings on which he relied in this regard.  For example, although the

transcript contains handwritten forms in support of Plaintiff's application and appeal (Tr.

189-234), nothing in the record indicates how long it took Plaintiff to complete the

forms, the amount of difficulty she encountered in doing so, or whether she did so

without assistance.  Further, the record does not reflect that Plaintiff was engaging in

woodworking at any point after her injury.  Rather, a consulting psychologist noted

Plaintiff's report that "she used to do all kinds of woodworking but she doesn't do much

of that anymore."  (Tr. 348.)  Finally, the ALJ failed to explain how Plaintiff's other

activities – caring for her children, driving a car[3] or performing unspecified household

chores – involved the repetitive use of her right arm such that they undermined Dr.

Renneker's opinion on this point.

Regardless of any error in this context, however, substantial evidence supports

the ALJ's decision to reject Dr. Renneker's conclusion regarding Plaintiff's ability to

perform repetitive movements of her right arm.  As the ALJ noted, no "objective

evidence" in the record supported Dr. Renneker's determination on this point.  No other

medical opinion precluded Plaintiff from engaging in repetitive movements of her right

arm.  Plaintiff argues that Dr. Renneker's objective findings substantially support her

conclusion that Plaintiff was limited to non-repetitive use of her right arm.  Specifically,

---

[3]       The ALJ also erred in his recitation of Plaintiff's testimony regarding her
ability to drive.  In his decision, he noted, "She said in applications that
she cannot drive because of her pain, but she admitted at the hearing that
she drives regularly for up to two hours at a time."  (Tr. 28.)  At her
hearing, however, Plaintiff testified: "I honestly can't even drive my own
personal vehicle. . . . [M]y longest trip was when I went to see Dr.
Renneker in Reynoldsburg, Ohio.  It was a two hour drive."  (Tr. 49.)

Plaintiff points to Dr. Renneker's conclusions observations that Plaintiff had: (1) sensory deficit in the right C6 dermatome; (2) decreased strength in the right biceps and deltoid muscles and right radial wrist extensor; and (3) muscle spasms with active neck motion. However, Dr. Renneker did not connect those findings to her conclusion that Plaintiff was not capable of repetitive movements with her right arm.  Nor does Plaintiff explain how these observations support Dr. Renneker's conclusion with respect to this limitation.[4]  Accordingly, although the ALJ's characterization of the other record evidence may be troubling, the objective evidence in the record provides substantial support for his decision to reject Dr. Renneker's opinion regarding this issue.  *See Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (noting that, when "'remand would be an idle and useless formality,'" courts are not required to "'convert judicial review of agency action into a ping-pong game'") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).

> **4.**      **Whether the ALJ Erred in Not Adopting the FCE and Dr. Renneker's Opinion in Their Entirety**

Plaintiff argues that the ALJ erred in failing to incorporate into Plaintiff's RFC all of the limitations assigned to her by the therapists who performed her June 2009 FCE and by Dr. Renneker.  Although an ALJ is not required to adopt each and every finding of medical sources to which he has assigned weight, the ALJ is required to explain why he relied on certain findings and not others.  *See, e.g., Fleischer v. Astrue*, 774 F.

---

[4]      Further, although the FCE revealed decreased strength in her right arm and hand, Plaintiff performed within the 96th percentile in a test of gross reaching and handling, and the therapists who performed the FCE only limited her to occasional – rather than rare – repetitive movements of the arms.  (Tr. 337-38.)

Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ

must give some indication of the evidence upon which he is relying, and he may not

ignore evidence that does not support his decision, especially when that evidence, if

accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he

RFC assessment must always consider and address medical source opinions.  If the

RFC assessment conflicts with an opinion from a medical source, the adjudicator must

explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2,

1996).

     In his decision, the ALJ assigned great weight to the FCE performed by

occupational and physical therapists in June 2009, (Tr. 28), and, with the exception of

her opinion regarding Plaintiff's ability to use her arms, to Dr. Renneker's opinion

regarding Plaintiff's limitations (Tr. 29).  Plaintiff argues that the ALJ erred, however, in

failing to explain why he omitted from Plaintiff's RFC the therapists' findings that Plaintiff

could only occasionally reach or perform repetitive arm motions and Dr. Renneker's

conclusion that Plaintiff would require a five-minute break after 30 minutes of sustained

neck flexion.[5]

     Plaintiff's argument is well taken with respect to Dr. Renneker's opinion that

Plaintiff could not engage in sustained neck flexion.  The requirement of Ruling 96-8p is

---

[5]     Plaintiff makes the same argument regarding the ALJ's inclusion of a
     sit/stand option in Plaintiff's RFC, contending that the FCE required a
     "sit/stand/walk" option.  (Plaintiff's Brief ("Pl. Br.") at 4.)  However, in their
     FCE, the two therapists opined that Plaintiff required "[l]ight work where
     she will be able to change positions frequently, i.e., sit to stand *or walk*."
     (Tr. 333 (emphasis added).)  Accordingly, the ALJ's calculation of
     Plaintiff's RFC included this finding from the RFC.

20

clear: an ALJ must explain his decision not to adopt a medical source opinion that conflicts with his RFC.  Here, despite granting Dr. Renneker's opinion great weight, the ALJ did not include limits on Plaintiff's ability to sustain neck flexion in his calculation of her RFC.  Because these limitations conflict with the RFC – as the RFC contains no limits on these activities – SSR 96-8p requires the ALJ to explain their omission.  A review of the ALJ's decision reveals that he did not explain his reasons for rejecting these limitations.

The Commissioner argues that the ALJ's inclusion of a sit/stand option accommodated Plaintiff's need for a five-minute break after 30 minutes of sustained neck flexion.  However, the Commissioner points to nothing in the record – or in the ALJ's decision – suggesting that the ALJ included the sit/stand option to accommodate this particular limitation, or that such an option would address this limitation.  Accordingly, the ALJ erred in failing to explain his omission of Dr. Renneker's limitation on Plaintiff's sustained neck flexion, and Plaintiff is entitled to remand on this issue, so that the ALJ can detail his reasons for failing to include the limitations in the FCE and in Dr. Renneker's report not otherwise included in the RFC.

Plaintiff's argument regarding the limitation assigned by the physical and occupational therapists who performed her FCE, however, is not well taken.  Although the ALJ granted great weight to the FCE and then failed to explain his decision to omit its limitations on Plaintiff's repetitive arm movement, to the extent that omission constitutes error,[6] that error is harmless.  During his testimony, the VE acknowledged

---

[6]     Given that the ALJ rejected Dr. Renneker's limitations on Plaintiff's ability
         to engage in repetitive movements of her right arm – and substantial

that, according to the DOT, the addresser position would not require repetitive arm movements on a "frequent or constant basis."  (Tr. 60.)  According to Plaintiff, this testimony implicitly acknowledged that the addresser position required occasional repetitive arm movements, and because the FCE precluded Plaintiff from any repetitive arm movements at all, Plaintiff could not perform the requirements of the position.  However, "[t]he DOT lists *maximum* requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."  SSR 00-4p, 2000 WL 1898704, * 3 (Dec. 4, 2000) (emphasis added).  Accordingly, the VE's testimony does not automatically preclude Plainitff – even when limited to no repetitive movement of the arms – from performing work as an addresser.  Thus, Plaintiff has not demonstrated error arising out of the ALJ's failure to explain his decision to omit the FCE's limitation on her repetitive arm movements from her RFC.[7]

### 5.   Whether the ALJ Improperly Relied on Plaintiff's Failure to Seek Immediate Medical Attention After her July 2008 Accident

In his decision, the ALJ concluded that Plaintiff was not credible and relied, in

_____

evidence supports that decision –  it was arguably reasonable for the ALJ not to discuss a similar limitation assigned by the physical and occupational therapists.

[7]   The Commissioner also argues that, because the FCE was performed by therapists, the ALJ was not bound by its conclusions and, thus, SSR 96-8p did not require him to explain the omissions at issue.  This argument, however, was not articulated by the ALJ in his decision.  It is well established that "the courts may not accept appellate counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Berryhill v. Shalala*, 4 F.3d 993, *6 (6th Cir. Sept. 16, 1993) (unpublished opinion)  (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citation omitted)).

part, on the conservative treatment she received for her injuries, in contrast with her "allegations of disabling symptoms." (Tr. 28.)  In this context, the ALJ noted that Plaintiff "did not even seek medical treatment until the day after her accident." (*Id*.)  Plaintiff argues that it was improper for the ALJ to find Plaintiff not credible on this point, as he "based his decision on his unsupported assumption about the medical presentation of whiplash." (Pl. Br. at 9.)  Plaintiff goes on to cite an Internet article regarding the symptoms and presentation of whiplash injuries.  (*Id*.)  This Court will not consider an external source in support of Plaintiff's argument. *See Domanski v. Celebrezze*, 323 F.2d 882, 885 (6th Cir. 1963) ("The review is limited to the record of the proceedings before the Secretary.")  However, the ALJ erred in relying on his own unsupported medical opinion to determine Plaintiff's credibility. *See, e.g., Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (noting that an ALJ "'must not succumb to the temptation to play doctor and make their own independent medical findings") (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).  Nonetheless, Plaintiff does not otherwise challenge the ALJ's credibility determination, or even argue that this particular error changed the outcome of her case.  Accordingly, this particular issue presents no basis for remand in this case.

### 6.    Plaintiff's Remaining Arguments

Plaintiff also argues that substantial evidence does not support the ALJ's calculation of her RFC because the ALJ's hypothetical to the VE did not match the RFC, and that the ALJ erred in failing to address all of the arguments raised in her post-hearing brief.  Given that this Court has directed that this case be remanded, and that,

on remand, the ALJ consider and account for the limitations he did not adopt into his RFC, these arguments may be moot.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for further proceedings consistent with this Memorandum Opinion and Order.


**IT IS SO ORDERED**.

_s/ Nancy A. Vecchiarelli_____
U.S. Magistrate Judge

Date: March 5, 2013

24